UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SmartPak Equine, L.L.C.,
                    Plaintiff,

         v.

CARL JANZEN, individually and d/b/a QWIK
AND SIMPLE, JAMES CHRISTIE, d/b/a
QWIK AND SIMPLE, and GRANT MYHRE,
d/b/a QWIK AND SIMPLE,

                    Defendants.

04-12454 RGS

CIVIL ACTION NO.

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION**

FILING FEE PAID:
RECEIPT # 60294
AMOUNT $ 150.00
BY DPTY CLK ECD
DATE 11/22/04

Plaintiff SmartPak Equine, L.L.C. ("SmartPak Equine") submits this memorandum in support of its motion for a preliminary injunction to stop defendants Grant Myhre and James Christie, doing business at Qwik and Simple (hereinafter collectively referred to as "Qwik and Simple"), from continuing infringement of United States Patent No. 6,733,771 (the "'771 patent"). The '771 patent pertains to the administration of feed supplements to horses. SmartPak Equine is the assignee of the '771 patent, which issued on May 11, 2004.

I.    **Statement of Facts**

A.    **Administration of Horse Supplements Before the '771 Patent**

Before the invention of the '771 patent, the typical method of administering horse supplements was cumbersome, imprecise, and messy. '771 Patent, "Background of the Invention," col. 1, l. 60 - col. 2, l. 18. Horse supplements, such as vitamins, joint supplements, and dewormers, were typically sold in powder or pellet form and packaged in large plastic tubs containing many doses. *Id.* at col. 1, ll 54-55. In circumstances where the horse is boarded, the barn staff, who is usually charged with feeding the horses, scooped out the correct dose of the correct supplement from these tubs and added the supplements to the horses' feed each day. *Id.* at col. 1, l. 61 - col. 2, l. 3. This "scoop method" of administering supplements placed a tremendous burden on the barn staff, who often deliver multiple supplements to each horse in the barn. *Id.* at col. 1, l. 60 - col. 2, l. 8.

The scoop method of administering supplements had several other drawbacks. At times, the barn staff failed to deliver the correct dosage of a supplement, because they scooped too much or too little of the supplement. *Id.* at col. 2, ll. 9-12. Furthermore, because many different supplement tubs were crowded in the feed room, the supplement-specific scoops were often mixed up. Gisholt Decl. at ¶ 4. Other times, the barn staff might forget entirely to add a needed supplement to a horse's feed. And because many horses are often boarded together in one barn,

1

the scoop method made it difficult for owners to ensure that their horses' supplements were not being fed to other horses. '771 Patent, col. 2, ll. 21-24. The scoop method was also very messy, with supplement tubs cluttering the barn. Gisholt Decl. at ¶ 4.

The barn environment posed several challenges to the potency of supplements delivered via the scoop method. When the barn staff failed to reseal the supplement tubs, the supplements were exposed to oxygen, moisture and sunlight, which decreased the potency of the supplements. '771 Patent, col. 2, ll. 44-48. In some cases, horse owners pre-mixed their own supplements, which could result in an unintended chemical reaction that compromised the quality or decreased the potency of the supplements. *Id.* at col. 2, ll. 49-54. For example, the mixture of copper with Vitamin E--two common ingredients in supplements--causes the vitamin E to lose 90% of its potency in just 10 days. *See* C.R. Dove and R.C. Ewan (1994), *Effect of trace minerals on the stability of vitamin E in swine grower diets*, Journal of Animal Science 69(5): 1994.

### B.    The Invention of the '771 Patent

The inventors of the '771 patent, Rebecca Minard ("Minard") and Paal Gisholt ("Gisholt"), are horse owners who were determined to improve upon the scoop method. After months of experimentation, Minard and Gisholt developed a new and improved method for administering feed supplements to horses through the use of customized supplement packages that ensured precise dosing, prevented cross-contamination, and protected the supplements from oxygen and moisture. Gisholt Decl. at ¶ 5. These methods are described and claimed in the '771 patent, which issued on May 11, 2004.

Claim 1 is representative of the methods claimed in the '771 patent. Claim 1 claims a method involving three steps. '771 patent, at col. 11, ll. 2 - 25. The first step calls for the provision of a multiple-sectioned package made of a polymer (or plastic) material. In the second step, supplements selected for a specified horse are added to one or more of the package sections.

- 2 -

The supplements are required to be precisely measured within about five weight percent or less of a specified amount. The final step of the claimed method requires feeding the supplements to the specified horse. Figure 1 of the '771 patent illustrates an exemplary supplement package according to the patent.



FIG. 1

While the package itself was not new, the method of feeding precise doses of a customized supplement regimen to horses was entirely new and unobvious. The U.S. Patent and Trademark Office carefully reviewed the patent application that resulted in the '771 patent. During the review, the Patent Examiner noted the "importance to horse supplementation of controlled dosages for individual horses." Gisholt Decl. at ¶ 6. After the claim limitation requiring precise dosing was added to the claims (i.e., "within about 5 weight percent or less of a specified amount"), the Patent Examiner allowed the application to issue as the '771 patent. Hence, the inventors brought to the horse industry a new and precise method of administering supplement feed materials that had never before been seen in the industry. The new method was precise and simple; it cured the problems of the prior art scoop method.

## C.    Minard and Gisholt Launch SmartPak Equine L.L.C.

Recognizing that their invention could greatly improve the care of horses, Minard and Gisholt launched a new business called SmartPak Equine L.L.C. to commercialize their new method of administering supplements to horses. Minard and Gisholt assigned the '771 patent to SmartPak Equine, and implemented a business model based predominantly on the efficient and effective practice of the method claimed in the '771 patent. Id. at ¶ 7.

The business model works best when SmartPak Equine purchases feed supplements in bulk from commercial suppliers. SmartPak Equine then repackages the supplements, with the permission of each supplier, in precise dosage amounts for particular horses according to its customers' orders. The precisely packed doses are delivered in so-called "SmartPaks" to SmartPak Equine's customers. *Id.* at ¶ 8. An excerpt from SmartPak Equine's catalogue shows an exemplary SmartPak fed to a horse named Legato:

### Peter Leone and Legato
Lionshare Farm, Greenwich, CT



**Peter's Career Highlights**
Silver Medalist – Atlanta Olympic Games,
3 time winner of Grand Prix of New York,
North American Champion Rider – Spruce
Meadows

**Legato's Honors**
Team Silver, Atlanta Olympic Games
1996; Winner of the U.S. Open Jumping
Championship, Winner of the Grand Prix of
New York

**About Legato**
"Legato has had the look of a winner from the first moment I met him as a four year old. You can see it in his eyes. Power, heart, and the rare character of knowing when it is a big event and being his best."



**Legato's SmartPak $78.05**
Glenzen GL *page 8*
Aconlytes *page 21*
Vitamin E & Selenium *page 13*
MSM *page 11*

**Peter Says**
"SmartPak means peace of mind. I know that Legato and each of his successors get the right supplements in the right amount every day. I set the program and SmartPak makes it happen. If I want to change something all I have to do is email the change and it's done!"

As shown above, a SmartPak contains one dose of each supplement for a particular feeding, often containing the horse's full regimen. *Id.* at ¶ 8. Each day, members of the barn staff simply peel the seal off the SmartPak that corresponds to a particular horse and add its contents to the horse's feed. Because each SmartPak is labeled with the horse's name, the barn staff can easily determine which SmartPak should be fed to each horse. Gisholt Decl. at ¶ 9. Horse owners who use SmartPaks are confident that their horses are receiving a precisely measured dose of their horses' entire daily supplement regimen. They are also confident that their horses' supplements are not being fed to another horse. Unlike supplements packaged in

- 4 -

large tubs with lids that are often discarded by barn workers seeking to simplify administration, SmartPak supplements stay fresh because they are individually sealed with lids that protect the supplements from oxygen and moisture. *Id.* at ¶ 10.

A central feature of SmartPak Equine's business model is its automatic replenishment policy, which ensures that a horse owner never runs out of supplements for his or her horse. SmartPak Equine sells SmartPaks in 28-unit allotments; and every 28 days, SmartPak Equine automatically ships another 28 SmartPaks to the horse's owner. Whereas the scoop method required horse owners to monitor the amount of powder or pellet supplement in each tub and order additional supplements as their supply dwindled, SmartPak customers automatically receive a fresh supply of supplements each month. *Id.* at ¶ 11.

Since SmartPak Equine began commercializing the invention claimed in the '771 patent in May 2000, sales of SmartPaks have steadily grown. *Id.* at ¶ 12. Indeed, as testimonials of several of SmartPak Equine's customers demonstrate, the invention has revolutionized the horse feed industry:

- Sandy Collier, an accomplished reigned cow horse rider, stated that "SmartPak is the easiest way to insure high quality, very fresh, pre-measured supplements without any extra cost. It's the best idea for convenience since baled hay! I know that each horse is getting exactly what I feel he needs."

- Fred Merriam, the first American to win an individual medal at a World Driving Championship, also uses SmartPaks: "No more early morning spills, no lids, no forgotten supplements, and no more cluttered grain room shelves. Thanks SmartPak!"

- Peter Leone, a silver medalist with his horse Legato at the Atlanta Olympic Games, noted that "SmartPak means peace of mind." He continues: "I know that Legato and each of his successors get the right supplements in the right amount every day. I set the program and SmartPak makes it happen."

*Id.* at ¶¶ 13-15. In addition to these famous horse riders, thousands of others have become SmartPak customers. *Id.* at ¶ 12.

SmartPak Equine's success did not come without tremendous effort, investment, and sacrifice. Indeed, because SmartPak Equine was the first retailer of custom-packaged horse supplements, it was required to invent a market for its product. SmartPak Equine located suppliers, convinced them to trust SmartPak Equine to exercise great care in repackaging their products, created a manufacturing and distribution plan, and developed innovative marketing techniques. For example, to introduce the SmartPak system to customers, SmartPak Equine distributed free samples of SmartPaks containing "horse treats." *Id.* at ¶ 16.

SmartPak Equine obtained legal advice about the propriety of repackaging and reselling branded goods where such brands were owned by another. SmartPak Equine has received written or oral permission from each of its suppliers to repackage the supplier's supplements and to use the supplier's trademark. In exchange, SmartPak Equine agreed to diligently track each supplement lot, from the supplier to the customer. If a supplier recalls a supplement, SmartPak Equine can quickly notify the affected SmartPak customers. Conversely, if a SmartPak customer reports a problem with a particular supplement, SmartPak Equine has the ability to report back to the supplier which lot was responsible for the problem. SmartPak Equine spent thousands of dollars implementing a computerized lot-tracking system and several employees are engaged in lot tracking as part of their employment duties. *Id.* at ¶ 17.

SmartPak Equine also requires that its SmartPaks meet strict quality control standards. For example, SmartPak Equine keeps its supplements within a certain temperature range and it refuses to mix supplements from different manufacturers together in the same wells or sell outdated supplements. SmartPak Equine has thrown away pounds of supplements that were not sold before their expiration date because it refuses to sell outdated supplements. SmartPak Equine has also obtained licenses to sell pharmaceuticals. *Id.* at ¶ 18.

To further ensure the long-term viability of the commercialized invention and to enhance the integrity of the industry, SmartPak Equine was a founding member of the National Animal Supplement Council ("NASC"), an organization that promotes responsible regulation of the animal supplement industry by working with the Food and Drug Administration and the American Association of Feed Control Officers.   SmartPak Equine has invested hundreds of man hours in the development of NASC's Adverse Event Reporting System, which is intended to ensure that any adverse events experienced by customers of member companies are reported promptly to the FDA's Center for Veterinary Medicine.  *Id.* at ¶ 19.  In short, SmartPak Equine is deeply committed to responsible pioneering in the horse supplement industry.

### D.    Defendant Janzen Launches Qwik and Simple

Defendant Carl Janzen is a former employee of SmartPak Equine.  *Id.* at ¶ 19.  Janzen's employment with SmartPak Equine was pursuant to a Proprietary Rights and Non-Competition Agreement ("Non-Compete Agreement"), which obligated Janzen to maintain SmartPak Equine's confidences and prohibited him from competing directly or indirectly with SmartPak Equine for one year after his termination.  During his employment with SmartPak Equine from May 2001 to February 2003, Janzen acquired extensive confidential knowledge and information about SmartPak Equine's products and business model.  For example, Janzen was privy to information regarding SmartPak Equine's marketing strategies, production metrics, plans for production automation, website marketing metrics, standard operating procedures, and employee manual.  He also knew information relating to each of SmartPak Equine's suppliers, having been the primary person responsible for purchasing for a brief period of time.  He had access to volume information, purchase prices, terms, and customer lists, some of which was highly confidential.  *Id.* at ¶ 21.

In February 2003, Janzen quit SmartPak Equine, and in violation of his Non-Compete Agreement, started doing business as Qwik and Simple in direct competition with SmartPak Equine. *Id.* at ¶ 22. After Janzen announced his intention to compete with SmartPak Equine, attorneys for SmartPak Equine reminded Janzen of his obligations under the Non-Compete Agreement. In a letter dated March 27, 2003, Janzen's attorney responded that "Janzen does not operate a business of any kind, either individually or through a business entity." He further stated that SmartPak Equine's assertion that Janzen formed a company to provide custom-packed horse supplements "is completely untrue and without any foundation in fact." *Id.* at ¶ 23.

SmartPak Equine's lawyers sent two further two letters, dated April 1, 2003, and November 25, 2003 to Janzen's counsel demanding assurances that Janzen had not established a business. When Janzen failed to respond to either letter and Qwik and Simple's advertised phone lines appeared to have been disconnected, SmartPak Equine presumed that Janzen had decided to comply with the Non-Compete Agreement. *Id.* at ¶ 24.

### E.    Qwik and Simple's Infringing Products

The '771 patent issued in May 2004. Soon after, SmartPak Equine became increasingly concerned that Qwik and Simple was not only still in business, but was also infringing the '771 patent. *Id.* at ¶ 25. After seeing a Qwik and Simple advertisement in a trade journal for a product entitled "QAS Supplement Delivery System," SmartPak Equine corresponded with Janzen and defendant Grant Myhre, a new owner Qwik and Simple. *Id.* at ¶¶ 24-25. (SmartPak Equine now believes that Janzen sold his interest in Qwik and Simple earlier this year to defendants Grant Myrhe and James Christie.) As recently as August 26, 2004, counsel for defendant Myhre expressed his view that Myhre's activities do not infringe the '771 patent. *Id.* at ¶ 26.

- 8 -

SmartPak Equine's own investigation, however, establishes to the contrary. On October 28, 2004, an employee of SmartPak Equine placed an order with Qwik and Simple for the advertised "QAS Supplement Delivery System." *Id.* ¶ 27. The SmartPak employee received two shipments of supplements, ostensibly because the company had "run out" of lid material. The first shipment was intended to tide the customer over, and was a mixture of the four supplements combined together in 14 resealable bags (the products in the bags were free to interact). The second shipment was a shipment of 28 trays. *Id.* ¶ 28. The trays received from Qwik and Simple last week manifestly established both the operation of a competing business and infringement of the '771 patent.

Like SmartPaks, the QAS Supplement Delivery System trays are labeled with the horse's name. *Id.* at ¶ 29, Exh. C, (hereinafter referred to as the "QAS Brochure"), at 3. In another clear imitation of the SmartPak Equine business model, Qwik and Simple sells its custom-packaged horse supplements in 28-day supplies and automatically ships a new batch each month. See QAS Brochure at 3. Additionally, QAS has copied SmartPak Equine's "horse treats" marketing technique, which Janzen knew to be extraordinarily successful based on confidential information he received while an employee. *Id.* at ¶ 34.

While Qwik and Simple has copied many aspects of SmartPak Equine's products and business model, it has not replicated SmartPak Equine's responsible business practices. For example, several suppliers have informed SmartPak Equine that Qwik and Simple has not obtained consent from them to repackage and sell their trademarked supplements. *Id.* at ¶ 30. Further, Qwik and Simple does not meet the suppliers' quality control requirements. For example, one the supplements ordered is called Cosequin, which is manufactured by a company called Nutramax. Nutramax does not allow SmartPak Equine to mix Cosequin with other

products and it is highly doubtful that it allows Qwik and Simple to do so, yet the bag of supplements received from Qwik and Simple contained a mixture of Cosequin and other supplements. *Id.* at ¶ 31.

More fundamentally, it appears that the current owners of Qwik and Simple have not taken any steps to register with the Commonwealth of Massachusetts or to incorporate or formally organize itself in any other way. Qwik and Simple appears to be solely the name under which the owners of Qwik and Simple do business. Qwik and Simple's website and promotional materials are conspicuously silent about the individuals doing business as Qwik and Simple. Despite advertising itself as located in Pembroke, Massachusetts, Qwik and Simple has not filed any certificates with the town clerk of Pemroke, Massachusetts as required by Mass. Gen. Laws ch. 110 § 5. Younkin Decl. at ¶ 4. Indeed, a certificate listing Janzen as the owner of "QAS L.L.C." was *cancelled* in August 2004. *Id.* at ¶ 5

Moreover, Myrhe, as a resident of New Hampshire, is obligated to file a certificate appointing the Pembroke clerk as his agent upon whom process may be served. Mass. Gen. Laws ch. 227 § 5A. Myrhe has not filed any such certificate. *Id.* at ¶ 6.

### F.    Qwik and Simple Aggressively Markets Its Infringing Product

Just last week at an industry trade show, SmartPak Equine got further confirmation that the QAS Supplement Delivery System infringes the '771 patent and that Qwik and Simple is aggressively seeking to erode SmartPak Equine's market share and goodwill by selling an infringing system. The trade show, Equine Affaire, is one of the largest horse expositions in the Northeast. It was held last week in West Springfield, Massachusetts from November 11 - 14, 2004. For the past four years, SmartPak Equine has successfully marketed SmartPaks at the Equine Affaire trade show. Before this year, Qwik and Simple has never made an appearance at that trade show. However, much to SmartPak Equine's surprise, Qwik and Simple attended the

2004 Equine Affaire as an official sponsor and aggressively marketed its infringing system to current and future SmartPak Equine customers. *Id.* at ¶ 32-33.

As a sponsor at Equine Affaire, Qwik and Simple was given a premium location at the exposition within 200 feet of SmartPak Equine's booth, prime advertising space in materials promoting Equine Affaire, and extensive signage and loudspeaker announcements throughout the event. Qwik and Simple was also named as a sponsor on the Equine Affaire web site, which provided a link to the Qwik and Simple web site where the QAS Supplement Delivery System is sold. With an overall attendance estimated by the show's organizer of over 100,000, Qwik and Simple's sponsorship of Equine Affaire exposed tens of thousands of horse owners and many current SmartPak customers to the infringing QAS Supplement Delivery System. *Id.* at ¶ 33.

SmartPak Equine believes that if Qwik and Simple is allowed to consummate the infringing sales that it solicited at the Equine Affaire, it will cause lasting and irreparable harm to the new industry built by SmartPak Equine. In addition, SmartPak Equine is increasingly concerned that Qwik and Simple's loose business practices, such as blending products together without permission, may drive supplement suppliers from the custom-packaged market altogether. This would have potentially disastrous consequences for SmartPak Equine customers, employees, and investors. The continued presence of Qwik and Simple in the marketplace not only will erode SmartPak Equine's market share, but also will taint the industry that SmartPak Equine has worked so diligently to establish. *Id.* at ¶¶ 36-40.

## II.    Argument

SmartPak Equine seeks a preliminary injunction enjoining the defendants from making, using, offering to sell, selling, or importing the QAS Supplement Delivery system anywhere in the United States. In determining whether to grant a preliminary injunction in a patent infringement suit, courts weigh the following four factors: (1) the movant's likelihood of

success on the merits; (2) the irreparable harm that may be suffered by the moving party if the injunction is not granted; (3) the balance of hardships favors; and (4) the public interest. *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1364-65 (Fed. Cir. 2002); *see also Inverness Medical Switzerland GmbH v. Acon Labs., Inc.*, 323 F. Supp.2d 227, 234 (D. Mass. 2004).

No one factor is dispositive; each factor is measured against the others and against the relief sought. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). In this instance, each of the four factors weighs in favor of a preliminary injunction to prevent the irreparable harm to SmartPak Equine's by Qwik and Simple's continued presence in the market.

**A.    SmartPak Equine Is Likely to Succeed On the Merits**

**1.    Qwik and Simple Induces Infringement and Contributorily Infringes the '771 Patent**

Because Qwik and Simple copied SmartPak Equine's business model, which is based exclusively on commercializing the invention claimed in the '771 patent, it is clear that Qwik and Simple is infringing the patent. More particularly, to establish infringement of a method claim, the accused infringer must perform every step of the claimed method. *See RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1266 (Fed. Cir. 2003). One need only analyze the first claim in the '771 patent to conclude that Qwik and Simple (in conjunction with its customers) performs every step of the claimed method. The following claim chart, which compares claim 1 of the '771 patent with the QAS Supplement Delivery System, demonstrates this:

| Claim 1 of the '711 Patent | QAS Supplement Delivery System |
|---|---|
| A method for administering supplement feed materials to a horse, comprising: | The QAS Supplement Delivery System is advertised as "an easy and fast way to ensure your horse receives the supplement he needs." QAS Brochure at 2. |

| | |
|---|---|
| (a) providing a multiple-sectioned unitary package comprising a polymer material of construction, | In the QAS Supplement Delivery System, "[e]ach supplement is custom packaged in individual serving compartments." Brochure at 3. A SmartPak Equine employee obtained a sample supplement tray from Qwik and Simple. The tray is made of a polymer material. Gisholt Decl. at ¶ 28. |
| the package comprising a plurality of the package sections; | In the QAS Supplement Delivery System "[e]ach supplement is custom packaged in individual serving compartments." QAS Brochure at 3. The tray obtained from Qwik and Simple contains multiple compartments. Gisholt Decl. at ¶ 29. |
| (b) adding to one or more package sections one or more edible supplement feed materials that have been selected for a specified horse, | In the QAS Supplement Delivery System "[e]ach supplement is custom packaged in individual serving compartments." QAS Brochure at 3. A SmartPak employee ordered specific supplements for a horse named "Nifty" from Qwik and Simple. Qwik and Simple delivered these supplements in a custom packaged container for "Nifty." Gisholt Decl. at ¶¶ 27-29. |
| one or more package sections containing the one or more feed materials in an amount within about 5 weight percent or less of a specified amount, | Qwik and Simple claims that the QAS Supplement Delivery System "is an affordable way to ensure your horse receives the *proper dosage* and the correct supplements every day." Brochure at 2 (emphasis added). Qwik and Simple sells supplements by weight. Gisholt Decl. at ¶ 35, Exh. D (hereinafter referred to as the "QAS Catalog"). |
| the one or more feed materials chosen from among vitamins, minerals, electrolytes, proteins, or herbs; and | Among the supplements packaged in the QAS Supplement Delivery System are vitamins, minerals, electrolytes, proteins, and herbs. *See* QAS Catalog. |
| (c) administering the supplement feed materials from the package to the horse. | Qwik and Simple's brochure instructs customers to "[e]ach day take the packet out of the bottom slot in the metal box, remove the easy-off lid and add to your horse's grain." QAS Brochure at 2. |

QAS is liable for inducing infringement of the '771 patent because it performs the initial steps of the claimed method and then sells the results of these steps to its customers for the express purpose of performing the final step of the claimed method (*i.e.*, feeding the supplements to a horse). *See* 35 U.S.C. § 271(b); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370

- 13 -

F.3d 1354, 1365 (Fed. Cir. 2004) (company that performs first step of two-step method patent and then sells result to another party for performance of the second step induces infringement); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 145 F.3d 1303, 1312 (Fed. Cir. 1998) (finding that defendant induces infringement of a method patent by selling device that met some limitations of the method and advertising a use of the device that met other limitations).

Additionally, Qwik and Simple's sale of custom-packaged supplements constitutes contributory infringement of the '771 patent. *See* 35 U.S.C. § 271(c); *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1267 (Fed. Cir. 2003) (stating that "a party's acts in connection with selling equipment may . . . constitute active inducement of infringement or contributory infringement of a method claim"). As explained above, Qwik and Simple's customers use the custom-packaged supplements sold in the QAS Supplement Delivery System to practice the method claimed in the '771 patent. The custom-packaged supplements sold by Qwik and Simple constitute a material part of the patented method, and they are not a staple item of commerce with substantial noninfringing uses. Accordingly, Qwik and Simple contributorily infringes the '771 patent. *See Avery Dennison Corp. v. UCB Films PLC*, No. 95 C. 6351, 1997 U.S. Dist. LEXIS 13594, at *12 (N.D. Il. Sept. 3, 1997) (denying defendants' motion for summary judgment on plaintiff's claim of contributory infringement where defendants performed the initial step of a patented method and other companies performed the remaining steps).

### 2. The '771 Patent is Valid

The '771 patent, like any issued United States patent, carries a statutory presumption of validity. 35 U.S.C. § 282; *see also Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998) ("[A] patent is presumed valid, and this presumption exists at every stage of the litigation."). "Where the challenger fails to identify any persuasive evidence of

- 14 -

invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Id.* at 1088 (affirming grant of preliminary injunction).  Hence, unless and until Qwik and Simple presents credible evidence of invalidity, SmartPak Equine is entitled to rely on the statutory presumption of validity.

### B.    SmartPak Equine Will Be Irreparably Harmed If A Preliminary Injunction Is Not Granted

SmartPak Equine will be irreparably harmed if a preliminary injunction is not granted. As explained below, SmartPak Equine is entitled to a presumption of such harm because of its strong showing of a likelihood of success on the merits.  Indeed, even if SmartPak Equine were not entitled to a presumption of irreparable harm, which it is, the facts in this case make clear that SmartPak Equine will, in fact, be irreparably harmed if Qwik and Simple is not enjoined during the pendency of this suit.  In the first instance, damages may not be recoverable because the individuals who are doing business as Qwik and Simple may not be able to cover a judgment. Moreover, SmartPak Equine will be irreparably harmed because Qwik and Simple's presence in the market will tarnish the goodwill that SmartPak Equine has built in the horse supplement industry and cause it to lose market share.

### 1.    Irreparable Harm Is Presumed

The Federal Circuit has held that where the patent holder has established a strong likelihood of success on the merits, the patent holder is entitled to a presumption of irreparable harm. *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1367 (Fed. Cir. 2001) (affirming grant of preliminary injunction based in part on district court's reliance on presumption of irreparable harm).  As set forth in the claim chart above, Qwik and Simple clearly infringes claim 1 of the '771 patent.  And by statute, the '771 patent is presumed

valid. 35 U.S.C. § 282. Hence, SmartPak Equine is entitled to a presumption of irreparable harm.

### 2.    Damages May Not Be Recoverable

SmartPak Equine, in fact, will be irreparably harmed if Qwik and Simple is allowed to continue to sell its infringing product during this litigation. Defendants Myhre and Christie are merely doing business in the name of Qwik and Simple. Qwik and Simple is not a corporate entity from which damages may be collected. While SmartPak Equine may look to the personal assets of the individual defendants to satisfy a judgment, their assets may be insufficient, particularly in light of the availability of treble damages based on willful infringement. Accordingly, it is likely that SmartPak Equine will not be fully compensated by an award of money damages following adjudication of its claims. *See Eli Lilly & Co v. Premo Pharm. Labs., Inc.* 630 F.2d 120, 137 (3d Cir. 1980) (finding that the patent holder would suffer irreparable harm absent a preliminary injunction in part because "damages could very conceivably run beyond [the defendant's] ability to pay them"); *Colonial Data Techs. Corp. v. Cybiotronics Ltd.*, No. 3:96 CV 2 (GLG), 1995 U.S. Dist. LEXIS 21697, at *22-23 (D. Conn. 1996) (finding that the patent holder would suffer irreparable harm absent a preliminary injunction in part because its ability to collect judgment after trial was uncertain).

### 3.    Loss of Goodwill And Tarnishing of Custom-Packaged Horse Supplement Industry

Although Qwik and Simple's system is inferior to SmartPak Equine's system (*e.g.*, it mixed supplements), SmartPak Equine is nevertheless concerned that customers will be enticed by Qwik and Simple's lower prices and by barn managers who are being paid by Qwik and Simple to persuade horse owners to switch. Gisholt Decl. at ¶ 40. The harm to SmartPak Equine is particularly acute because the company has invested heavily in generating customer goodwill.

SmartPak Equine has spent significant time and money introducing custom-packaged horse supplements to the market. These efforts have been especially costly and time-consuming because SmartPak Equine is committed to enhancing the integrity of the supplements industry. These responsible pioneering efforts are finally paying dividends, but Qwik and Simple's imitation supplement system will undoubtedly undermine the goodwill that SmartPak Equine has established. *See Bio-Technology Gen. Corp. v. Genetech*, 80 F.3d at 1553, 1566 (Fed. Cir. 1996) (finding that loss of revenues and goodwill may constitute irreparable harm).

Indeed, in light of Qwik and Simple's irresponsible business practices (*e.g.*, lack of quality control) and inferior quality, customers of the QAS Supplement Delivery System may stop purchasing custom-packaged supplements altogether, further eroding SmartPak Equine's market. *See Turbo Tek Ents., Inc. v. F.P. Feature Prods, Inc.*, No. 87-C-7438, 1997 WL 19558, at *17 (N.D. Ill. Oct. 7, 1987) (finding that plaintiff would suffer irreparable harm unless defendant was enjoined from infringing plaintiff's patent because defendant's inferior products could taint the market). Similarly, upon learning that Qwik and Simple runs afoul of their strict quality control standards, suppliers may choose to get out of the custom-packaged market altogether rather than trying to distinguish businesses like SmartPak Equine, which meet the suppliers' requirements, from businesses like Qwik and Simple, which do not.

### 4.     Loss of Market Share

Finally, Qwik and Simple's unlawful sales of the QAS Supplement Delivery System pose an *imminent threat* to the success of SmartPak Equine's business. Last week, tens of thousands of horse owners and barn managers--the very people to whom SmartPak Equine markets and sells its patented product--were exposed to Qwik and Simple's infringing QAS Supplemental Delivery System at the Equine Affaire horse show. These horse enthusiasts examined Qwik and Simple's products, took Qwik and Simple brochures and catalogs, and chatted with Qwik and

Simple's sales representatives.  It is beyond doubt that some of these people, possibly including

current SmartPak Equine customers, have already ordered the QAS Supplement Delivery System

or will do so soon.  A preliminary injunction is necessary to stop these orders from being filled

and to prevent Qwik and Simple from continuing to market its infringing QAS Supplement

Delivery System.  *See Mykrolis Corp. v. Pall Corp.*, No. Civ.A. 0310392GAO, 2004 WL

937330, at *11 (D. Mass. April 30, 2004) (granting preliminary injunction because continued

sales of the accused product would "likely result in significant, irreparable loss of sales and

market share to [plaintiff]" because of the direct competition between plaintiff and defendant).

SmartPak Equine has spent significant time and money developing long-lasting

relationships with its SmartPak customers, who tend to purchase automatic monthly delivery of

SmartPaks.  Gisholt Decl. at ¶ 39.  Hence, when Qwik and Simple coaxes a SmartPak Equine

customer to switch to the infringing QAS Supplemental Delivery System, SmartPak Equine loses

more than a single sale; it loses a steady source of income.  Additionally, SmartPak Equine loses

revenue from the sale of related horse products such as blankets, pads, stirrups, and the like

because SmartPak Equine has a standing offer of free delivery of any items in its catalogue when

delivered with the monthly SmartPak deliveries.  Hence, decreased sales of SmartPaks will also

decrease sales of related products.  *See 3M Unitek Corp. v. Ormco Co.*, 96 F. Supp.2d 1042,

1051-52 (C.D. Cal. 2000) (granting preliminary injunction where holder of patent on ceramic

orthodontic brackets argued that it would suffer irreparable harm absent a preliminary injunction

because orthodontists who purchase ceramic brackets from the defendant would also purchase

other orthodontic products from the defendant).

### C.    The Balance of Hardships Favors Granting the Injunction

The balance of harms in this situation clearly favors SmartPak Equine.  Qwik and Simple

has made little investment in its business; rather, its business is based on a blatant copying of

- 18 -

SmartPak Equine's business and its patented invention. Qwik and Simple revenues are derived

wholly from illegal conduct including breach of a Non-Compete Agreement, theft of trade

secrets, and patent infringement. "[O]ne who elects to build a business on a product found to

infringe cannot be heard to complain if an injunction against a continuing infringement destroys

the business so elected." *See Inverness*, 323 F. Supp.2d at 252 (granting a preliminary injunction

to patent holder) (quoting *Windsurfing Int'l. Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed.

Cir. 1986)).

In contrast, the presence of the QAS Supplement Delivery System on the horse

supplement market will create substantial hardship to SmartPak Equine, which has invested

heavily in this industry. SmartPak Equine has virtually created the industry both because of the

patented invention, but also because of the relationships that it has established with suppliers.

SmartPak Equine has been in this business for 5 years, whereas Qwik and Simple is only just

getting its business off the ground. *See Critikon, Inc. v. Beckton Dickinson Vascular Access,

Inc.*, No. 93-108-JJF, 1993 U.S. Dist. LEXIS 19959, at *32 (D. Del. July 16, 1993) (finding that

balance of harms tipped in favor of the patent holder where the defendant was still in the early

stages of marketing the accused device and the patent holder's product had been on the market

for over one year). Moreover, the clear evidence of infringement discussed above favors

SmartPak Equine here as well. *See H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d

384, 390 (Fed. Cir. 1987) (noting that the strength of plaintiff's claim of infringement is a

favorable factor to consider when weighing the balance of hardships).

### D.    The Public Interest Favors Granting The Injunction

A preliminary injunction is necessary to serve the public interest in protecting and

enforcing valid patent rights in order to promote invention and innovation. *Smith Int'l, Inc. v.

Hughes Tool Co.*, 718 F.2d 1573, 1577-78 (Fed. Cir. 1983). The patent laws spurred Minard and

Gisholt to invent the methods patented in the '771 patent and to build a business based on the practice of those methods. SmartPak Equine has attracted millions of dollars in venture capital, based in part on the belief that the '771 patent would allow the company to recoup early losses. Unless this Court issues a preliminary injunction, the purposes of the patent system will be undermined by Qwik and Simple's continued infringing conduct. *See Critikon*,1993 U.S. Dist. LEXIS 19959, at *31-32 (finding the public interest is best served by entering a preliminary injunction and thereby preventing the defendant from expanding its market presence during the pendency of the litigation).

## III.    CONCLUSION

For the reasons set forth above, plaintiffs respectfully request that the Court grant a preliminary injunction enjoining Qwik and Simple from any direct infringement, contributory infringement, or inducement of infringement of the '771 patent.

Dated:   November 19, 2004                    SMARTPAK EQUINE, L.L.C.,

                                              By their attorneys,


                                              Denise W. DeFranco (BBO# 558859)
                                              Jeremy A. Younkin (BBO# 654047)
                                              FOLEY HOAG
                                              155 Seaport Boulevard
                                              Boston, MA 02210-2600
                                              Tel. (617) 832-1000
                                              Fax (617) 832-7000